UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIANNE LOTHRINGEN,

                Plaintiff,                    Case No. 01-CV-72077

vs.

                                        HONORABLE DENISE PAGE HOOD
                                        HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION

### I.    BACKGROUND

Marianne V. Lothringen brought this action under 42 U.S.C. § 405(g) and § 1383(c) to challenge a final decision of the Commissioner denying her application for Supplemental Security Income (SSI) disability benefits under Title XVI of the Social Security Act.  Plaintiff last worked in 1995 (R. 76).  Both parties have filed motions for summary judgment, and for reasons stated below IT IS RECOMMENDED that Defendant's motion be DENIED. and Plaintiff's motion be GRANTED IN PART and the case remanded for further proceeding consistent with this Report and Recommendation

#### A. Procedural History

Plaintiff applied for SSI on January 1, 2000, alleging that she was disabled as of July 1, 1996 (R. 51).  After Plaintiff's application was initially denied, a hearing was held on January 4, 2001.  Due to a blank tape from that hearing, Plaintiff had another de novo hearing that began on

October 28, 2002, that was resumed and concluded on January 16, 2003.[1]  (R. 320, 352).

Plaintiff was again denied benefits on April 24, 2003 (R. 22 - 29).  On July 7, 2004, the Appeals

Council denied Plaintiff's request for review (R. 7 - 8).

**B. BACKGROUND FACTS**

**1. PLAINTIFF'S HEARING TESTIMONY**

At her October 28, 2002, hearing with Administrative Law Judge (ALJ) Michael F.

Wilenkin, Plaintiff testified that she is no longer able to work as a hair dresser because,

following a car accident her arms 'go numb' if she holds her hands out in a manner like a hair

dresser must ("grasping, holding things, using scissors").  (R. 324 - 325).  She described how her

"hands go numb if I have to hold my arms over my head, they hurt, my shoulder hurts, burning, I

don't have any feeling, it goes up to the elbow."  (R. 325).  This numbness occurs not only when

she elevates her arms above her head but also any time she does "repetitive things with [her]

fingers," her wrists burn, tingle and have a numbing sensation.  (R. 325).  Her hand, elbow and

wrist pain starts in her fingers and works its way up her arms through her elbow and up into her

shoulder joint.  Her fingers sometimes swell when she sleeps.  (R. 326 - 327).  Plaintiff claimed

that the pain is bad at night when she is sleeping and during the day when she uses her hands.

(R. 327 - 328).

Plaintiff wears splints which keep her hands and arms from hurting as much.  Rain and

humid weather makes the arm pain in her arms worse.  (Id.).  In addition to her splints, she takes

Glucosamine to help her cartilage regenerate, but she notes that she has not noticed any benefit

---

[1] The tape from the original hearing (January 4, 2001) was blank, District Judge Denise Page
Hood issued a stipulation and order to remand for a de novo hearing.  (R. 266 - 267).

2

from it.  (Id.).

Plaintiff has a lot of pain in her left knee when she is walking or sitting for long periods of time.  Dr. Wiater prescribed a knee brace which she has been wearing one for approximately a year.  She described that: "it has two metal things on the side to keep the knee together and it's Velcro and it wraps around so it holds the knee in place."  (R. 329).  With the brace immobilizing her knee she doesn't "hear the popping as much, but it still is painful when [she is] walking or sitting."  (R. 331).  Plaintiff described the pain in her knees as "burning in [her] kneecaps like a shooting, like knives or somebody sticking something painful."  (R. 332). Plaintiff stated that she could only take over the counter Tylenol or Motrin because she has a history of ulcers and stomach problems.  (Id.).  Plaintiff also tried water therapy two or three times but she stopped that because it aggravated her knee pain.  (R. 331 - 332).  Plaintiff has discussed the possibility of surgery but Dr. Wiater only wants to use surgery as a last resort.  (R. 333).

Plaintiff also had a burning sensation in her lower spine, just above her hips.  (R. 333 - 334).  Plaintiff has treated her back with heating pads, ice packs and an over the counter liquid called "Heat."  Plaintiff gets some relief from these treatments but says that "the pain is still there."  No one has suggested surgery for her back.  (R. 334).  Plaintiff also gets migraine headaches and suffers from vertigo.  Plaintiff says that the vertigo is a result of TMJ in her jaw that has caused problems with her inner ear.  (R. 335 - 336).

Plaintiff also suffers from stomach problems and often has "the runs, diarrhea, acid...very bad stomach cramps, stomach pain, running to the bathroom, throwing up."  (R. 336).  Plaintiff takes Prevacid and Nexium and said that she has to schedule an appointment to see a gastro

doctor about some blood in her stool. She stated that her appetite has been okay, although she often eats something light to prevent an upset stomach. Plaintiff described what causes her trouble sleeping at night: "there's a lot of spasms and thrashing at night, tingling in my hands, my fingers, it goes up, it burns, tossing and turning trying to find a comfortable way to sleep." (R. 336 - 339).

Plaintiff's mother helps her with housework and chores as well as with dressing and getting into the shower because her pain and numbness will prevent her from doing so on her own. Plaintiff testified that she was sometimes able to do some light dusting. She no longer has any hobbies. (R. 339 - 340). Plaintiff can stand for about 15 to 20 minutes, sit for about 15 to 20 minutes and walk for about 15 to 20 minutes before she has a burning sensation and pain in her legs and knees. (R. 340 - 341). Plaintiff testified that she cannot stoop, squat, or get down on her knees without pain in her back or knees accompanied by dizziness. It is painful for Plaintiff to go up and down stairs and she is able to lift and carry about five pounds at a time, but that her "hands would start going numb with the grasping motion and then I'd feel the pain in my wrists from the weight." (R. 341 - 342).

Plaintiff testified that she lies down and covers her eyes for an hour or two once or twice a day when she gets migraines. She noted that her conditions have worsened over the last year and a half. (R. 342).

Plaintiff's attorney questioned Plaintiff after ALJ Wilenkin. Plaintiff testified that at 240 pounds she was 90 pounds over her normal weight and that this weight gain had been a result of a thyroid condition and her lack of activity following the car accident. Plaintiff related that she had been fired from her job as a receptionist because she could not 'keep up' with her duties of

4

answering the telephone, writing, taking money, stocking, walking, sweeping and doing the laundry because of her disabilities.  Picking up objects and holding a pen was difficult and caused pain and that after a short while she would drop objects as her hand goes numb.  Plaintiff also testified that lifting five pounds repetitively would cause her pain, she wears a wrist brace at night, she soaks her hands in hot water during the day and has fallen 'a couple of times' over the last few years as a result of her knees locking, popping, or giving out.  (R. 345 - 349).

ALJ Wilenkin adjourned the hearing to be finished at a later date.  Just before doing so, he asserted that the Plaintiff's recollection was different from her recollection at the previous hearing with regard to the length of her relationship with Dr. Wiater.  Plaintiff testified that she had significant memory problems and could not confirm how long her relationship with Dr. Wiater had been.  (R. 350 - 351).

The hearing continued on January 16, 2003.  Plaintiff testified that since the original hearing[2] her pain in her hands and knees have gotten worse, while her back pain has remained pretty much the same.  (R. 355 - 356).  Plaintiff testified that because of the pain in both of her knees she uses the cane prescribed by Dr. Wiater to assist herself when getting up and for walking.  (R. 358).

### 2. MEDICAL EVIDENCE

#### A.  BEFORE JULY 1, 1996, DISABILITY DATE

Plaintiff first visited her long term treating physician, Dr. Jerome Wiater about possible bunions and a curvature of the spine on May 31, 1983.  Dr. Wiater's exam showed a mild apex

---

[2] The original hearing in front of ALJ Wilenkin on January 4, 2001, in which the tape was blank and the case was remanded for a de novo hearing.

5

right thoracolumbar scoliosis.  Plaintiff's leg lengths were equal.  X-rays showed minimal rotational change and that she had developed small spurs over the medial aspect of the first metatarsals bilaterally at the first MP joint in her feet.  X-rays showed a normal appearing bone architecture, perhaps narrowing at that level.  Dr. Wiater recommended back exercises and that she wear flat heeled shoes.  (R. 92).

Plaintiff's next visited Dr. Wiater on October 9, 1984, after a fall.  Plaintiff reported pain in the coccygeal area.  X-rays showed an abnormal bend of the proximal segment that Dr. Wiater thought might indicate a fracture.  Dr. Wiater instructed Plaintiff in constructive management.

On December 9, 1984, Plaintiff was rear ended in an automobile accident.  On December 18, 1984, Plaintiff was having discomfort radiating into the occiput and increased difficulty at the previous area of her coccyx.  She had no problems in the upper extremities and her neurovascular status was intact.  X-rays showed a slight increase of angulation.  (R. 92 - 93).

On January 15, 1985, Plaintiff reported continued neck discomfort particularly when driving or turning laterally.  Dr. Wiater found her gross neurovascular status was intact and that she had good motion of the neck.  He started her on a course of physical therapy, range of motion, traction, strengthening, moist heat and ultrasound.  (R. 93).

On May 2, 1985, Plaintiff had proximal neck discomfort, some radiation into the upper extremities, numbness in her fingers and recurrent occipital headaches.  Dr. Wiater noted that the X-rays looked good and that Plaintiff was to continue to work on her therapy.  (Id.).

Plaintiff next visited Dr. Wiater following another car accident.  Plaintiff had left lateral neck pain, up to the area of her ear.  Plaintiff showed an intact neurovascular status of her upper extremities and the x-rays of the cervical spine were within normal limits.  Dr. Wiater referred

6

her to therapy for massage, mobilization, range of motion and strengthening (R. 93 - 94).

Plaintiff returned on July 20, 1989. Plaintiff continued with neck pain and some radiation to the shoulders, particularly when carrying. Dr. Wiater thought that Plaintiff's symptoms indicated a thoracic outlet syndrome so he sent her to physical therapy. On October 19, Plaintiff had the same symptoms primarily at the temporomandibular joint and radiation into her arms and shoulders. Per Dr. Wiater's request, Plaintiff saw Dr. John Glover to evaluate her for thoracic outlet syndrome. Dr. Glover found evidence of a thoracic outlet syndrome and recommended Plaintiff continue with the exercise program. (R. 94 - 95).

At her June 5, 1990 visit, Dr. Wiater noted that Plaintiff had developed activity related lower back pain with increased discomfort at night. Plaintiff had good mobility and was instructed in back exercises for mobility and strengthening. On October 25, Dr. Wiater noted that Plaintiffs neck and upper and lower extremity pain were aggravated by her pregnancy, but remained unrelieved after delivery. Plaintiff reported a sense of loss of balance and that she was still having moderately frequent night discomfort. (R. 96).

Dr. William Schneider examined Plaintiff on July 22, 1993, at the Royal Oak Emergency Center at William Beaumont Hospital following a motor vehicle accident. Plaintiff was 8 months pregnant when the accident occurred and said that her stomach hit the steering wheel. Plaintiff complained of mild neck stiffness but denied any other pain. Dr. Schneider's physical exam showed Plaintiff's neck to be supple without cervical lymphadenopathy; tenderness noted on the left paraspinal cervical region of C5 and C6; no osseous deformity. X-ray was negative for fracture or dislocation. Dr. Schneider instructed the Plaintiff to treat her neck with a warm, moist heating pad and to take Tylenol as needed for discomfort. (R. 156 - 157, 171).

7

Plaintiff next visited Dr. Wiater on July 23, 1993, after having crushed and lacerated her right long finger on a door.  Plaintiff visited Dr. Wiater for suture removal and a follow-up.  Dr. Wiater noted "some paresthesias along the radial boarder but her two point is intact.  Her profundus and sublimis are pulling through."  (R. 97).

Plaintiff, who was again pregnant, was in a third car accident and visited Dr. Wiater on August 3, 1993.  Plaintiff's previous improvement with her neck pain was reversed after the accident when she experienced recurrent left neck pain and recurrent hypoesthsias of both upper extremities.  Plaintiff's low back pain had some sense of radiation to the posterior aspect of the left proximal thigh.  Plaintiff showed good mobility with mild restrictions in forward flexion and lateral bending.  (Id.).

On September 16, 1993, Plaintiff delivered a baby boy and continued with neck discomfort and low sacral coccygeal pain.  Plaintiff's x-rays in flexion and extension and of the lumbosacral spine were satisfactory.  Having missed her appointment on October 28 Plaintiff next saw Dr. Wiater on August 11, 1994, with continued problems with a sense of numbness aggravated by her work activity of cutting hair.  Dr. Wiater believed there may be some change going on at C7-T1.  (R. 98).

On April 11, 1995, Plaintiff visited Dr. Wiater with right knee difficulty (that may have been hurt in a car accident) that gave her difficulty running and going up and down stairs.  Plaintiff also reported "mild locking" of her knees.  (R. 99).  Dr. Wiater noted an impression of chondromalacia patellae.  Plaintiff's mother told Dr. Wiater that Plaintiff was still having difficulty with her knee on stairs.  (Id.).  On July 11, 1995, after again complaining of neck pain and having symptoms in both upper extremities, Dr. Wiater noted that the Plaintiff was possibly

8

suffering from thoracic outlet syndrome.  (R. 100).

On July 28, 1995 Plaintiff was given a CT of the head.  Radiologist Matthias J. Kirsch, M.D. found nothing abnormal in the CT.  (R. 189).  On the 29th, Plaintiff was seen by Dr. Daniel S. Richardson.  Dr. Richardson noted that the Plaintiff came to the emergency room with "the worst headache of her life."  Plaintiff woke in the morning with a headache in the occipital region, has had a pounding feeling that has gotten worse and has nausea but is without vomiting, fever or chills.  Dr. Richardson's physical examination of Plaintiff was not remarkable.  Dr. Richardson's assessment was "Acute Cephalgia, R/O Subarachnoid and Meningitis."  Plaintiff was given Demerol and Vistaril, was reexamined and found to be asymptomatic.  Plaintiff was given a prescription for Vicodin.  (R. 190 - 191).

### B.  AFTER JULY 1, 1996, DISABILITY DATE

Plaintiff visited Dr. Wiater after a fall which caused increased parapatellar and medial joint line discomfort on April 29, 1997.  Plaintiff showed a mild degree of clinical crepitation evident at the patellofemoral joint and had medial joint line tenderness.  X-rays showed adequate alignment and well maintained joint space.  Dr. Wiater ruled out the possibility of a medial meniscal tear and noted that there was probable chondromalacia patellae.  (R. 100).  On June 3, 1997, Plaintiff returned with persisted discomfort, "largely para and retropatellar, mild medial joint line."  (R. 101).

Almost one year later, May 12, 1998, Plaintiff visited Dr. Wiater with increasing numbness and tingling in her hands.  Plaintiff has bilateral knee discomfort and shows patellofemoral crepitation.  On referral from Dr. Wiater, Plaintiff had an EMG on July 10, 1998.

Dr. Lisa Grant, who performed the EMG, recorded the impression of evidence of bilateral carpal tunnel syndrome, mild on the right and moderate on the left without any evidence of denervation. Dr. Grant also noted that there was no evidence of superimposed radiculopathy, generalized neuropathy, or myopathy.  (R. 102).

On July 15, 1998, Dr. Wiater wrote a letter stating that because of her symptoms and difficulties, Plaintiff was "restricted in work duties."  (R. 103).  On October 6, 1998, Plaintiff visited Dr. Wiater after another fall which left her with difficulty walking and kneeling.  Dr. Wiater noted that Plaintiff was overweight and encouraged weight reduction.  Plaintiff showed patellofemoral crepitation left greater that right.  (R. 105).  On her March 30, 1999, visit, Plaintiff was having problems with pain over the left sternoclavicular joint especially when moving her left shoulder.  Plaintiff showed a mild deep pressure tenderness at the left sternoclavicular joint without gross instability.  X-rays were satisfactory and Plaintiff continues to have great difficulty with both knees when walking and bending.  Dr. Wiater further noted that there was patella crepitation and vastus medialis views show asymmetry with the lateral joint space narrowing.  (R. 106).

Dr. Wiater on  October 11, 2002, reported that Plaintiff "remains disabled from work" and she "is very restricted in her independent ability for prolonged standing, prolonged sitting or prolonged walking." (R. 317).  On October 25, 2002, in a "To Whom It May Concern" letter,  he adds that in addition to her limited ability to stand and walk for more than short periods before needing to change position, she was also compromised in her ability "to use her upper extremities for motions such as lifting, carrying, pushing, pulling, gross and fine manipulation and overhead activities. (R. 314).  On November 11, 2002, he checked items in a Physical

Capacity Evaluation form limiting her to sitting 15 minutes standing 20 minutes and walking 20 minutes at a time, and 1-2 hours total in an 8 hour day for each task of sitting and standing and 0-1 hour total for walking.  (R. 316).   This form restricted simple grasping, pushing or pulling of arm controls, or fine manipulation with either hand.

On July 28, 1998, Plaintiff returned to the Emergency room at Beaumont Hospital after a fall in which she banged her left knee, hit her left side, came down on both outstretched hands and had pain in both her TMJs with more pain in the right than the left.  Dr. Bradford Walters did a physical examination of Plaintiff and found some mild tenderness primarily to the right TMJ.  Plaintiff had pain in the left wrist but none in the snuffbox or with movement of the first metacarpal.  Other than that pain there were no other problems, swelling, or deformity in her metacarpals or phalanges.  (R. 199).  Plaintiff's left knee had an abrasion and was "diffusely tender but no joint effusion, decreased range of motion secondary to pain."  (R. 199).  X-rays of the left wrist and left knee did not show any fracture.  There was minimal degenerative change in the knee.  Dr. Walters impression was multiple contusions.  (R. 199 - 200).

On April 7, 2000, Plaintiff presented with numbness in her hands, pain with movement in her neck and pain and disability with both knees involving any prolonged standing, walking or stair climbing.  Plaintiff's right knee was worse than the left, with a frequent sense of locking and instability with risks of her slipping and falling.  Upon examination, Plaintiff showed significant patellofemoral crepitation and mild restriction in neck mobility to lateral bending bilaterally.  X-rays showed "[l]ong weight bearing on the left and 30 degree flexion showed narrowing of the medical compartment and early varus alignment.  There are minor but similar changes on the right knee."  (R. 239).  An April 18th MRI of Plaintiff's left knee showed

11

"[a]dvanced osteoarthritis changes/chondromalacia; most advanced medial compartment and similarly anterior compartment."  (R. 242).

A May 18, 2000, ultrasound exam showed normal upper extremity arterial examination at rest bilaterally with no evidence of any underlying obstructive disease (R. 241).  On May 25, 2000, Dr. Wiater noted that an EMG showed bilateral carpal tunnel syndrome and a chronic left C7, T1 radiculopathy.  The left knee MRI showed advanced arthritis, primarily medial and anterior compartments (R. 239).  In a one sentence letter "To Whom It May Concern," Dr. Wiater wrote that Plaintiff was under his care for degenerative joint disease and that she remained "totally disabled."  (R. 151).

A June 15, 2000, MRI showed mild degenerative disk disease at the levels of C5 - 6 and C6 - 7 (R. 240).  X-rays from August 31, 2000, showed varus alignment with narrowing.  Dr. Wiater informed Plaintiff of these findings and noted that Plaintiff is going to try the orthotics and weight reduction.  (R. 238).

Plaintiff also saw Dr. Jack Litwin several times from May, 1997, to January, 2000.  On a May 29, 1997 progress report, Dr. Litwin noted that Plaintiff complained of knee pain after she slipped and fell two months earlier.  On June 27, Dr. Litwin's progress report notes that Plaintiff's lab work was very good.  Plaintiff's cholesterol was 149, triglycerides 110, HDL cholesterol 41and LDL cholesterol 86, all of which Dr. Litwin described as "marvelous."  Plaintiff's electrolytes were normal, liver function tests were normal, thyroid was normal and her cholesterol HDL ratio was 3.6.  Dr. Litwin prescribed Redux 15 mg one b.i.d. because she was "a little bit overweight."  The August 22, 1997, progress notes of Dr. Litwin note that Plaintiff complained of frequent headaches that last about 5 to 6 hours and that light and sound aggravate

12

the headaches sometimes making her sick to her stomach to the point of vomiting.  Dr. Litwin

noted that as a result of a car accident her arms and forearms go numb when she drives.  (R. 139

- 142).

On February 26, 1998, Plaintiff visited Dr. Litwin complaining of a cough, sore throat

and a pounding in her back.  Dr. Litwin diagnosed her with an upper respiratory infection and

gave her Amoxicillin and asked her to also take some Robitussin DM over the counter.  (R. 137).

On March 3, 1998 Plaintiff returned to Dr. Litwin with a sinus infection, URI and numbness in

her arms.  Dr. Litwin prescribed more Amoxicillin and suggested she take some Robitussin for

her cough.  He also referred her to Dr. Wiater to examine the numbness in her arms.  (R. 136).

On July 20, 1998, Dr. Litwin noted that Plaintiff complained of a migraine and shooting

pains in the back of her neck.  Due to evidence of bilateral carpal tunnel syndrom, that was mild

on the right and moderate on the left, Dr. Litwin wrote Plaintiff prescriptions for bilateral carpal

tunnel splints and referred her to Dr. John Gilroy, a neurologist.  (R. 134 - 135).  On December

17, 1998, Plaintiff visited Dr. Litwin with another sinus infection and pain in both shoulders and

her neck.  Dr. Litwin prescribed Augmentin 875 and told her to use some over the counter

Nasonex nasal spray.  (R. 133).  Dr. Litwin prescribed Clairtin and amoxicillin 500 on July 27,

1999, in order to combat her nose, which showed signs of an allergy, and to help her with her

ears, that felt blocked.  (R. 132).

On August 8, 1999, Plaintiff was given a physical examination by Dr. Litwin.  Plaintiff

had bilateral carpal tunnel syndrom and bilateral Osgood-Schlatter disease in her knees.  The

physical examination and lab work showed the following: normal cholesterol; hemoglobin

slightly on the low side; normal blood sugar, creatinine and ulric acid; normal LFTs; MCH of

13

25.3, which is a little on the low side and MCHC of 30.6, which is a little on the low side as well.  TSH was normal at 4.93.  Dr. Litwin was a little concerned that the Plaintiff might suffer from iron deficiency.  (R. 131).  On August 19, Plaintiff was further tested for iron deficiency and Dr. Litwin believed that she had "a mild iron deficiency anemia, or something related to that."  Dr. Litwin therefore told Plaintiff to take one iron tablet per day.  (R. 130).  On September 10, 1999, Plaintiff visited Dr. Litwin concerned because of a lack of energy, dizziness and sore throat, coupled with exposure to some individuals who had mononucleosis.  Dr. Litwin's impression was that Plaintiff had an upper respiratory infection.  (R. 248).

On December 6, 1999, Dr. Litwin treated Plaintiff's upper respiratory infection with Claritin and Amoxicillin.  (R. 129).  On January 25, 2000, Dr. Litwin put Plaintiff on Allegra for her allergy symptoms because Claritin had been making her sleepy.  (R. 128).  On March 2, Plaintiff complained to Dr. Litwin of migraines accompanied with nausea.  Plaintiff also noted that she was under a lot of stress.  (R. 247).  Dr. Litwin prescribed amoxicillin and Ceftin for allergy symptoms and slightly enlarged tonsils.  On June 5, 2000 Plaintiff again complained of a cough and had some rhonchi when Dr. Litwin examined her.  Dr. Litwin prescribed her amoxicillin.  (R. 245).  Plaintiff returned to Dr. Litwin complaining of a sore throat and cough on August 7, 2000.  Dr. Litwin diagnosed her with a URI, thoracic outlet syndrome and bilateral knee problems compatible with a diagnosis of patellofemoral chondromalacia.  (R. 244).  After a dizzy spell, Plaintiff visited Dr. Litwin for a physical examination on September 28, 2000.  Dr. Litwin diagnosed the Plaintiff with bilateral carpal tunnel syndrome, bilateral Osgood-Schlatter disease in her knees, patello-femoral chondromalacia, hypothyroidism and iron deficiency anemia.  (R. 243).

After a fall, Plaintiff had X-rays taken of her left wrist and left knee on July 28, 1998, at Beaumont Hospital.  The impressions recorded by attending radiologist Dr. Henrietta A. Juras were negative for the left wrist, negative for fracture of the left knee and minimal degenerative change in the left knee.  (R. 121).  Dr. Bradford Walters found the Plaintiff to be alert, her vital signs stable, some mild tenderness in the right TMJ, no significant swelling in her wrists, hands, fingers and contusions secondary to her fall (R. 123).

Plaintiff saw Dr. Robert C. Erickson for evaluation of her red eye on September 18, 1998. On October 3, 1998, Dr. Erickson summarized the results of her exam.  Plaintiff complained of throbbing pain in her left eye and some green discharge in both eyes.  Plaintiff's visual acuity was 20/20 in both eyes and Dr. Erickson's impression was that she had conjunctivitis for which he recommended "Ocuflox, qid, OU for 7 days."  Dr. Erickson recommended that Plaintiff replace her contacts and that she have a complete eye exam after the infection cleared.  (R. 91).

A gynecological exam of Plaintiff on November 17, 1998, showed Plaintiff to be within normal limits and the pap smear showed endometrial cells and benign inflammatory changes. (R. 122).  Plaintiff had a mammogram on December 1, 1998.  There was no mammographic evidence of malignancy.  (R. 120).

Plaintiff was treated in physical therapy from June 1999, to September 1999.  (R. 202 - 227).  Plaintiff participated in three visits doing aquatic exercises by Physical Therapist Robin Goddard, M.P.T.  Plaintiff had poor attendance and had problems adjusting to aquatic treatment because of neck pain.  Plaintiff was discharged from physical therapy with her goals not achieved.  (R. 202).

On September 20, 1999, Plaintiff saw Dr. Richard F. Elton for multiple irritated and

15

tender papillomas of the eyelids and neck.  Dr. Elton surgically removed the lesions and submitted them for histopathologic examination.  (R. 107).

Plaintiff had a gynecological exam at Beaumont Hospital on November 23, 1999, that was within normal limits and showed hyperkeratosis present.  (R. 109).

On December 9, 1999, Plaintiff received a bilateral mammogram at Beaumont Hospital. The attending radiologist, Murray Rebner, M.D. noted that the mammogram was negative for malignancy.

Plaintiff was seen by Dr. Jack Kaufman for the Michigan Disability Determination Service on March 10, 2000.  Dr. Kaufman observed that the Plaintiff entered his office wearing bilateral braces for her wrists and used a quad cane, favoring her left lower extremity.  Dr. Kaufman noted that Plaintiff had been diagnosed with mild to moderate carpal tunnel syndrome; she had surgery on both knees as a child; probably has a degenerative disease in both of her knees; and has pain in her shoulders, elbows and other joints.  (R. 143).  Dr. Kaufman described Plaintiff as an "extremely obese" woman, who does not appear to be in pain, expressed relief when she sat down and was able to climb on the examining table without much difficulty.  (R. 144).  Dr. Kaufman further observed limited motion on lateral extremes of her neck.  When Plaintiff removed her splints, she demonstrated a fairly normal range of motion with her fingers and wrists. Her hands and fingers did not appear to be abnormal and she had decent grip strength (R.145-46 & 148).  Movement of her shoulders and left knee were limited.  She could not touch her toes, nor could she squat and recover.  Dr. Kaufman found considerable hypertrophy of the soft tissue surrounding both knees.  Plaintiff noted that her shoulder, elbow, and other joint pain limited her activities of daily living except for personal hygiene, light housekeeping and caring for her three children aged 6, 9 and 11.  Dr. Kaufman diagnosed Plaintiff with: exogenous

obesity, bilateral and mild carpal tunnel syndrome and bilateral chondromalacia of the patellae. (R. 145).  Dr. Kaufman also observed that  Plaintiff "appeared to be fatigued and exerting quite an effort in attempting to perform movements of her various joints."  (R. 146).  He thought Plaintiff could perform nearly all activities, except squatting and rising. (R. 147).  This included buttoning clothes, tying shoes, picking up coins and a pencil, writing and dialing a phone, even though she reported having to quit a work attempt as a cashier at her beauty salon because she could not stand, take money and write receipts (R. 147 & 143).

Dr. Lisa B. Grant performed another EMG, motor unit action potential analysis and nerve conduction studies on Plaintiff on April 14, 2000.  The EMG showed no evidence of muscle membrane irritability, chronic neuropathic units present in a left C8-T1 distribution, prolongation of the distal latency of the median sensory bilaterally across the carpal tunnel with low amplitude on the left with slowed nerve conduction velocities of the median motor bilaterally.  (R. 228).

From October 7, 1999, to July 17, 2000, Dr. Rudrick E. Boucher examined Plaintiff for auditory problems.  The results of an audiogram on May 23, 2000, indicated a slight high frequency sensorineural hearing loss for the left ear, however her hearing was found to be within normal limits for critical speech frequencies bilaterally.  Speech discrimination was within normal limits in quiet bilaterally.  Normal middle ear function bilaterally and stapedius reflex was evident with no decay for the right ear and decay for the left.  Plaintiff's ability to hear speech in noise in the left ear was severely reduced and she had no difficulty hearing speech in noise in her right.  The audiometric results were consistent with retrocochlear pathology for the left ear.  (R. 236).

### 3. VOCATIONAL EVIDENCE

17

On March 29, 2000, DDS physician Dr. Sadia Shaikh reviewed the medical evidence and completed a Residual Functional Capacity Assessment (RFC). He diagnosed Plaintiff with CTS, Chondromalacia of patilla and obesity. (R. 83). The RFC set the following exertional limitations: Plaintiff can occasionally and frequently lift or carry 10 pounds; stand or walk for a total of at least 2 hours in an 8 hour workday; sit for about 6 hours in an 8 hour workday; and has no limitation on pushing and pulling other than that given for lifting and carrying. (R. 84). The RFC set the following postural limitations: Plaintiff can frequently balance and occasionally climb, stoop, kneel, crouch and crawl (R. 85). The RFC allowed for the Plaintiff to reach occasionally and handle, finger and feel constantly. The RFC established no visual limitations and communicative limitations. (R. 86 - 87). The RFC limited Plaintiff to no exposure to vibration (R. 87). Dr. Shaikh found Plaintiff's claim that she can only stand or walk 3 - 5 minutes only partially credible and not supported by the medical record (R. 88).[3]

Dr. Peter Fotiu served as the vocational expert ("VE") and testified that if the description of Plaintiff's limitations are accurate she would be unable to perform any of her past work[4] or any other jobs in the State of Michigan. (R. 363 - 364). Dr. Fotiu said that the limiting factors from Plaintiff's testimony included "severe pain in various parts of her body" that caused "significant limitations and residual functions. She suffers from dizziness, balance problems,

---

[3] "Although client clearly is having significant difficulty and medical evidence does support a severe condition, medical evidence does not support the level of self-imposed restriction imposed by the client. ... Found partially credible." (R. 88).

[4] Dr. Fotiu summarized and characterized Plaintiff's work: she "worked as a receptionist, ... [I]t would be unskilled work. ... The exertional level was light. She worked as a hairdresser and instructor, which would be a skilled occupation. And the exertional level would be light. She ... worked as a salesperson, semi-skilled. This was in a salon or related to salon work, which would be semi-skilled, light exertional level. She worked at another facility as a salesperson for Such a Deal. And that would be semi-skilled, light exertional level." (R. 362 - 363).

migraine headaches and because of the headaches, she finds that she has to lie down one or two times a day, one to two hours at a time."  (R. 364).

ALJ Wilenkin then asked VE Fotiu a hypothetical question involving a person similar to Plaintiff in terms of age, education and past relevant work experience.  This hypothetical person:

> [E]njoys the residual functional capacity to sit six of eight hours of an eight hour workday, stand or walk two of eight hours of an eight hour workday.  Lift as much as ten pounds only occasionally and lesser weights somewhat more frequently.  Assume the history of complaints of pain and discomfort in a variety of places including the hands, knees, the lower back, stomach, the left arm, left clavicle.  A history of complaint of refractory diarrhea ... complaint of headache, dizziness and vertigo ... a complaint of left-sided hearing loss ...  Pain and discomfort in the right knee.  Assume that while the symptoms associated with these complaints are undoubtedly disconcerting, they are not for purposes of this query of sufficient severity, intensity or frequency to interfere with, or otherwise preclude functioning at the level suggested.  You may assume that certain limitations do obtain as a result of the conglomeration of all of these deficits working individually and in concert with each other.  In this regard, she should avoid activities requiring repetitive stooping, squatting, kneeling, crouching, bending.  She should not be required to engage in prolonged or protracted walking ... climb stairs or ladders ... twist or torque her torso throughout the extremes of range of motion ... not be required to use her hands for forceful gripping and grasping maneuvers ... or flex or extend her wrists forcibly ... to use any type of vibrating tool in the performance of work activities.  You may assume that, notwithstanding the presence of these complaints, the hypothetical individual nevertheless remains capable of sustaining herself on a full-time basis.  The deficits suffered or the modalities employed to treat the same have in no way interfered with the hypothetical individual's ability to perform the usual and customary cognitive aspects of vocational functioning.  By that I mean, she notwithstanding these deficits or these treatments is able to understand, remember and follow instructions, follow through with and complete assigned tasks in a timely and appropriate fashion.  Response appropriately to customary work pressures, supervisors, personnel, coworkers, the public and the like.  Lastly, you may assume that the deficits suffered or again the modalities employed to treat the same do not warrant that the hypothetical individual lie down during the course of a typical workday.  As an additional caveat, I would suggest that the hypothetical individual pretty much be allowed to change position between sitting and standing at her option.  In this regard, she should not be required to stand anymore than a maximum of 10 to 15 minutes at a time, nor should she be required to sit any more than a maximum of one hour at a time.  And even within those limitations she should be – again, should be allowed to change position at her option.

(R. 364 - 366).

VE Fotiu believed that this hypothetical person would not be able to perform any of the Plaintiff's past relevant work, but that she could perform some unskilled jobs such as that of a assembler, packager or sorter of which there were 3,500 such jobs in the metropolitan Detroit area, 6,000 jobs in the State of Michigan and over 750,000 in the nation. (R. 367).

### 5. THE ALJ'S DECISION

ALJ Wilenkin found that Plaintiff had not engaged in substantial gainful activity since January 27, 2002, and that the Plaintiff suffers from:

> severe degenerative joint disease of the knees, greater on the left, a possible history of chondromalacia of the knees, bilateral carpal tunnel syndrome, mild degenerative disc disease of the cervical region with some cervical radiculopathy, occasional headaches and migraines, possibly some low back pain, stomach problems and thyroid problems.

(R. 28)

These impairments did not meet the requirements or equal the level of severity contemplated under the listings included in Appendix 1 to Subpart P, Regulations No. 4. (Id.).

ALJ Wilenkin also found the Plaintiff's testimony of a need to lie down and an inability to engage in even nonexertional work to lack credibility. (Id.). ALJ Wilenkin found the Plaintiff to have a residual functional capacity to perform the physical exertion and nonexertional requirements of work except for:

> lifting over ten pounds on an occasional basis, any prolonged walking or standing, any sitting without the opportunity to sit or stand at will, or work that would involve any stopping, crawling, bending, climbing of stairs or ladders, twisting or torquing of the torso, flexion and extension of the wrists, or use of vibratory tools.

(Id.).

ALJ Wilenkin found that the Plaintiff was unable to perform her past relevant work and

that the Plaintiff's residual functional capacity for the full range of sedentary work is reduced by

the limitations that limit her residual functional capacity.  (Id.).  ALJ Wilenkin found Plaintiff to

be a 'younger' individual with a high school education and no transferable skills.  (R. 29).  He

determined that based on the Plaintiff's exertional capacity for sedentary work, the Plaintiff's

age, education and work experience and section 416.969 of Regulations No. 16 and Rules 201.27

and 201.28, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 directs a conclusion of "not

disabled."  (Id.).  ALJ Wilenkin said that even with her limitations, there are 3,500 jobs in the

Detroit metropolitan area and 6,000 in the nation that Plaintiff could perform and the Plaintiff

was not under a "disability" at any time through the date of the decision (Id.).  Therefore, ALJ

Wilenkin decided that the Plaintiff "is not eligible for supplemental security income under

sections 1602 and 1614(a)(3)(A) of Social Security Act (Id.).


## II.    ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and

Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B. FACTUAL ANALYSIS

Plaintiff raises three challenges to the Commissioner's decision: (1) ALJ Wilenkin failed to give appropriate weight to the substantially supported opinions and evidence of Plaintiff's treating orthopedist; (2) ALJ Wilenkin failed to appropriately consider the impact of Plaintiff's severe obesity on her RFC; (3) ALJ Wilenkin's determination as to the vocational impact of Plaintiff's RFC is not supported by the vocational evidence obtained.

Plaintiff argues ALJ Wilenkin did not give proper weight to Plaintiff's treating orthopedist, Dr. Wiater.  A treating doctor's opinion that a patient is disabled does not have controlling weight in a social security case on the ultimate issue of disability which is reserved to

---

[5] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

the administrative decision maker.  *See* 20 C.F.R. 404.1527(e) [for SSI § 416.913(e)]

("Opinions on some issues ... are not medical opinions, ... but are, instead, opinions on issues

reserved to the Commissioner"); 404.1527(e)(1) ("A statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are disabled");

404.1527(e)(3) ("We will not give any special significance to the source of an opinion on an

issue reserved to the Commissioner"); *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th

Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states

that she is 'disabled' or unable to work").  *See* 20 C.F.R. 404.1527(e) ("Opinions on some issues

. . . are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner"); 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or

'unable to work' does not mean that we will determine that you are disabled"); 404.1527(e)(3)

("We will not give any special significance to the source of an opinion on an issue reserved to

the Commissioner"); *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) ("[A]

claimant is not entitled to disability benefits simply because her physician states that she is

'disabled' or unable to work").

   In 20 C.F.R. 404.1513(b) & (c) [for SSI § 416.913 (b) & (c)] and SSR 96-5p the

Commissioner distinguishes between a treating source "statement about what [a claimant] can

still do despite . . . impairment(s)" and the formal administrative finding on "residual functional

capacity."  The former is a physician's opinion on either physical or psychological capacities for

work related activities.  The former, when based on the medical source's records, clinical and

laboratory findings,  and examinations can be considered a "medical opinion" under §

404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [ a claimant] can still do despite

impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and

severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion." Yet, because these medical opinions are different from the formal findings under § 404.1527(e) [SSI § 416.913(e)] on "disability" and on "residual functional capacity" -- which are subjects reserved to the Commissioner and which may be based on additional evidence in the record -- the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §1527(d)(2) [§ 416.927(d)(2)], *i.e.* the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."

ALJ Wilenkin clearly designates Dr. Wiater as "[o]ne of the claimant's treating physicians..." (R. 25). ALJ Wilenkin examined Dr. Wiater's progress notes and reports and nothing that he has said suggests that he did not give proper weight to his opinions and evidence except with respect to the issue of fine manipulation as noted below. (R. 26 - 27). After considering the records, notes and opinions of Dr. Wiater, ALJ Wilenkin determined that Plaintiff was not disabled.

While Dr. Wiater's one sentence letter of May 15, 2000 that Plaintiff is "totally disabled" (R. 151) and his October 11, 2002, report that "[s]he remains disabled from work: (R. 317) are conclusory statements to which the Commissioner need give little weight, the latter adds behavioral limitations that Plaintiff "is very restricted in her independent ability for prolonged standing, prolonged sitting or prolonged walking." These specifics of what she cannot do qualify as medical opinions. Plaintiff's counsel also points out that Dr. Wiater in reports of October 25, 2002, and November 22, 2002, add further specific limitations. On October 25, 2002, Dr. Wiater limited her ability to stand and walk for more than short periods

24

before needing to change position, restricted her upper extremities motions such as lifting, carrying, pushing, pulling, gross and fine manipulation and overhead activities. (R. 314). On November 22, 2002, he checked items in a Physical Capacity Evaluation from limiting her to sitting 15 minutes, standing 20 minutes and walking 20 minutes at a time, and 1-2 hours total in an 8 hour day for each task of sitting and standing no more than 1 hour total for walking. (R. 316). This form also noted restrictions in Plaintiff's ability to do fine manipulation and simple handling with either hand.

Thus, when the ALJ asserts his RFC is consistent with Dr. Waiter's restrictions of October 2002, he is probably correct with respect to the limitations on lifting or carry 10 pounds; standing or walking for a total of at least 2 hours in an 8 hour workday; sitting for about 6 hours in an 8 hour workday; and also on no limitation on pushing and pulling other than that given for lifting and carrying. It can also be said his RFC elements of frequently balance and occasionally climb, stoop, kneel, crouch and crawl are consistent with Dr. Waiter's opinions as of October 2002, that restricted but did not totally preclude such activities. Yet, the ALJ's RFC clearly is inconsistent with the November 22, 2002, check-list evaluation that limited Plaintiff to sitting and standing more than 1-2 hours total in an 8 hour day for each task of and walking no more than 1 hour total (R. 316). The several thousand assembly, sorting, and packaging jobs identified by the VE and relied on by the ALJ in his finding of non-disability required more total sitting and standing than 4 hours in a work day.

In addition, the RFC's anticipation that Plaintiff can reach occasionally and handle, finger and feel constantly would be inconsistent with the November 22 opinion of Dr. Wiater as well as his October 25 limitation on "fine" manipulation.

25

While the ALJ need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §1527(d)(2) [§ 416.927(d)(2)], *i.e.* the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  other substantial evidence in [the] case record" an ALJ must give reasons for rejecting a treating source opinion that has some medical support of an underlying condition that could cause that condition. The case law in this Circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability was binding on the Social Security Administration as a matter of law.[6]

Certain limitations of Dr. Wiater in his November 22, 2002, list of restrictions – such as the aggregate length of Plaintiff's ability to stand and sit in an 8 hour day – are not sufficiently supported in the record and can properly be rejected by ALJ Wilenkin.  So too is his new and unsupported diagnosis that Plaintiff has Fibromyalgia[7]. In addition, some of Dr, Wiater's restrictions  – those on prolonged standing, sitting or walking. and on the need to change positions, for which there is supporting medical evidence –  are adequately accommodated in ALJ Wilenkin's hypothetical.  Yet, the same cannot be said for the restrictions on simple

---

[6] *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

[7] Fibromyalgia is syndrome of chronic pain of musculoskeletal origin but uncertain cause. Stedman's Medical Dictionary 671 (27th ed.2000).  Its symptoms include severe fatigue, diffuse muscular soreness and tenderness which in certain instances can be debilitating, yet it is difficult to prove disability on this basis because of the absence of objective evidence to quantify the severity of the pain.

repetitive grasping, pushing or pulling of arm controls, or fine manipulation with either hand. The limitation on fine manipulation is in the October 25, 2002, report as well as the November 22, 2002, addition.  ALJ Wilenkin rejects the latter report on the sitting, standing and walking time limits because Dr. Wiater did not note any worsening of Plaintiff's condition from the October 2002 report.  Yet, this reasoning is not sufficient for rejecting Dr. Wiater's opinion on simple repetitive grasping, pushing or pulling of arm controls, or fine manipulation with either hand.

ALJ Wilenkin acknowledges Dr. Wiater's limitation of performing "gross and fine manipulation (R. 26 referring to R. 314) but then indicates that his hypothetical question was not inconsistent with these functional limitations.  Yet, his RFC in the hypothetical includes handle, finger and feel constantly which is inconsistent with fine manipulation as well as Dr. Wiater's limitations on November 22, 2002, on simple grasping.   While ALJ Wilenkin states that Dr. Wiater "did not indicate that [s]he was unable to engage in gross manipulation of the upper extremities" it is unclear whether means only arm movement or hand movement.  (R. 27). ALJ Wilenkin mistakenly states that his hypothetical question is consistent with Dr. Wiater's October 25, 2002, restrictions  – which limits *fine and gross manipulation.*  It is likely this mistake that caused him to not state any reasons for rejecting Dr. Wiater's opinions on this. While there may be a basis to reject his limitation on gross manipulation, it is not stated and is not for this Court to surmise.  ALJ Wilenkin's reasons for rejecting Dr. Waiter's November 22 restrictions on *simple grasping* are not adequate.[8]  Although not raised by the Plaintiff, this

---

[8] This is not to say there is no contrary evidence in the record.  For instance, the DDS examining consultant, Dr. Kaufman, thought Plaintiff could perform nearly all activities, except squatting and rising. (R. 147).  He noted that her hands and fingers did not appear to be abnormal and she had decent grip strength (R.145-46 & 148).  Dr. Kaufman specifically included buttoning clothes, tying shoes, picking up coins and a pencil, writing and dialing a phone, although what if any data this is based on is unclear

decision also does not provide reasons sufficiently specific reasons under SSR 96-7p to reject the credibility of Plaintiff. [9]

While the November 22 arm controls limitations also noted by Dr. Wiater are not relevant to the jobs the VE identified, his limitations on simple repetitive grasping, fine and gross manipulation with one or both hands seem relevant to the assembly, sorting and packaging jobs identified by the VE. Dr. Wiater's November 22, 2002, opinion restricting simple repetitive grasping and fine manipulation is not inconsistent with his earlier reports and opinions. It seems, rather, to be a reiteration on the fine manipulation limitation and a further elaboration on the restriction on even simple repetitive grasping. It is unfortunate that ALJ Wilenkin did not contact Dr. Wiater as is suggested by SSR 96-1p when treating source opinions are provided that are not clear to the ALJ nor are the reasons for such an opinion. Here it is not clear if all repetitive grasping is precluded (which seems extreme on the current medical record) or whether and what grasping in Dr. Wiater's opinion Plaintiff might do, and how frequently. It also might have been useful to determine if Dr. Wiater's opinion was based on his observations, test results, and medical experience with Carpel Tunnel Syndrome or if it was based largely on subjective accounts from the Plaintiff.

---

because Dr. Kaufman acknowledged that Plaintiff reported having to quit a work attempt as a cashier at her beauty salon because she could not stand, take money and write receipts (R. 143). There is also no evidence that Plaintiff's hand/wrist problems were so severe that a Carpel Tunnel release surgery be performed. The Commissioner's attorney argues unfairly that Plaintiff told the physical therapist that she did "everything" around the house, where that report shows that she "can't [illegible] afterwards" and she experienced an increase in numbness and had pain at 5/10 to 10/10 weekly (R. 121)

[9] The Commissioner requires that the decisions of Administrative Law Judges "must contain specific reasons for the [credibility findings], supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. The general reference to daily activities is not adequate.

Furthermore, there is significant medical evidence in the record that would support these limitations – Carpel Tunnel Syndrome and also suspicions of possible thoracic outlet syndrome which could compromise a network of motor and sensory nerves of the arm, the hand, and the region of the shoulder girdle. The record shows a long history of hand and wrist problems and some shoulder limitations, although her neck, back and knee problems seem more severe. Plaintiff was prescribed hand splints for her Carpel Tunnel Syndrome and reported to Dr. Kaufman that she could not even continue work as a receptionist because of hand limitations. (R. 143).

While the record is such that the ALJ's hypothetical sufficiently accommodated many of Dr. Wiater's limitations concerning Plaintiff's neck, back and knee problems, it only mentions the worker not being required to use her hands for *forceful* gripping and grasping maneuvers and extreme wrist movements or use of vibrating tools. These do not adequately accommodate restrictions on simple repetitive grasping or fine manipulation with either hand (again the restriction on pushing or pulling of arm controls does not seem relevant to the jobs identified by the VE).

Nor does the opinion of Judge Wilenkin sufficiently justify his rejection of these two restrictions noted by Dr. Wiater nor Dr. Wiater's precluding of even gross manipulation. Thus, the hypothetical question is flawed and Dr. Fotiu's answer to it cannot serve as substantial evidence to uphold the ALJ's decision. *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments'").

*Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994) (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)) and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."

While there has already been one remand, and the record is tediously long and difficult, it cannot be said that "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."[10]  There are reasons one might question certain parts of Plaintiff's testimony concerning her symptoms.  Nor can it be said that the record is complete as to how many of the assembly, sorting and inspection jobs might accommodate limitations on fine manipulation and simple repetitive grasping.  It is unfortunate that Plaintiff's counsel began what appeared to be a laborious cross examination of VE Fortiu by wanting to get all of the Dictionary of Occupational Title's job numbers to which the VE referred.  By the time cross-examination got around to determining which of the assembly, sorting and inspecting jobs required more than gross manipulation, that examination was being pressured under time limits by ALJ Wilenkin and was not thorough and precise.

VE Fotiu noted one screw sorting job that did not require fine manipulation (R. 379) but never gave any indication of the number of such jobs.  The inquiry regarding assembling fishing reels never got into the need for fine manipulation but only the need for "some" finger dexterity

---

[10] See, e.g.,  footnote 8.

30

(R. 381).  VE Fotiu did note that Plaintiff could not perform any of the jobs identified if Plaintiff could not do any repetitive grasping, pushing or pulling of arm controls, or fine manipulation (R. 385).  Yet, again, without a fuller clarification and possibly an explanation by Dr. Wiater as to exactly what he meant when he checked these boxes (and the basis for his opinion) it is not clear that Plaintiff, even with her Carpel Tunnel Syndrome, might have sufficient residual hand capacity to perform a sufficient number of sorting or packaging jobs to constitute substantial gainful employment.  Whether Plaintiff has the capacity for any assembly jobs is more problematic.

Thus the case should be remanded for further evidence from Plaintiff's treating source and any other medical evidence the Commissioner deems appropriate as well as further vocational expert evidence.  On remand, Plaintiff 's attorney can explore whether Plaintiff obesity causes any vocationally significant limitation of functions other than those on prolonged sitting, standing and walking already considered.

## III.   RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion be DENIED. and Plaintiff's motion be GRANTED IN PART and the case remanded for further proceeding consistent with this Report and Recommendation .

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically and in the same order raised, each issue contained within the objections.

Dated: December 30, 2005                          s/Steven D. Pepe
Ann Arbor, Michigan                               UNITED STATES MAGISTRATE JUDGE

Certificate of Service

      I hereby certify that a copy of this Report and Recommendation was served upon the attorneys and/or parties of record by electronic means or U. S. Mail on December 30, 2005.

                                              s/William J. Barkholz
                                              Courtroom Deputy Clerk